THOMPSON *v.* STATE.

4299                                   172 S. W. 2d 234

Opinion delivered June 14, 1943.

*Guy E. Williams,* Attorney General, and *Earl N. Williams,* Assistant Attorney General, for appellee.

McHANEY, J. Appellant, a Negro, was charged by information with the crime of murder in the first degree committed as follows, to-wit: "The said defendant, Henry Thompson, on the 23rd day of December, 1942, in Cleveland county, Arkansas, did unlawfully murder Mrs. Susie Vetito against the peace and dignity of the state of Arkansas." He was tried on said charge and was convicted on January 8, 1943, his punishment being fixed at death in the electric chair. Within the time allowed by law, he prayed and was granted an appeal to this court.

No abstract and brief has been filed by him or in his behalf. The Attorney General has abstracted the record, and the writer has carefully examined the record to determine whether any prejudicial error was committed.

The victim of this sordid tragedy was a white woman, married and living with her husband, Harry Vetito, a laborer, in a tent near Rison, Arkansas. Appellant also lives in a tent about two and one-half miles from Vetito. Both appellant and Vetito were working for Bert England, about four miles southwest of Rison. Mrs. Vetito disappeared in the afternoon of December 23, 1942, and a search for her was organized and conducted by Sheriff Glover and others, beginning about 5 p. m. of said day and continued until her dead body was found in an old well, on Mr. Vandermark's farm, between 12 and 1 o'clock p. m. of December 24. Wounds were found on her head, showing she had been struck with a blunt instrument, and other abrasions were found on her legs and knees. Dr. Robertson testified to the wounds on her head and, based on his examination and his medical knowledge, that she was not dead when thrown in the well. Mr. Buie, the undertaker, said that the body was not stiff when removed from the well and blood was still flowing from the wound in the back of her head. In the woods, near the Vetito home, a place was found where there had been wallowing around on

the ground. Blood spots were found on a board in the floor of the Vetito home which was removed and turned over to the State Police, and the ground at the well indicated a struggle had taken place. Tracks of a man and woman were found leading from the Vetito home and across a field, and plaster casts were made of these tracks which corresponded with the shoes of appellant and Mrs. Vetito.

Appellant had ridden to his home about noon with his employer on the day of this tragedy and did not work that afternoon. He and his wife were arrested and put in jail, but the wife was later released. A search was made of his home where clothing of his was found with blood spots on it and a pair of his shoes that corresponded with the plaster cast of his tracks, and a pistol with a broken cylinder and with blood spots on the barrel.

Confronted with all this evidence, appellant made a written confession of guilt, which, according to all the testimony, was freely and voluntarily made, and is as follows: "My name is Henry Thompson. I sometimes use the name of Frank Clemens. I am 44 years old and live about one mile south of Rison, Arkansas, on highway No. 79. I am married and my wife's name is Matile Thompson. On Wednesday, December 23, 1942, I was working for Bert England, unloading a sawmill off the trucks, at his farm about four miles southwest of Rison. We completed our work about noon and I rode to my home on Mr. England's truck. I knew that Mr. Harry Vetito and the others would not be home because they were going to work on a bridge. I had been thinking about robbing Mrs. Vetito. I knew that she kept money because I seed her with it and her husband would go to her for money. Her husband and I worked on the same job. When I got off the truck I went to my tent and my wife was not at home. I got my pistol, a 32/20 S&W, went down the highway to Mrs. Vetito's place. They lived in a tent about two and one-half miles from where I live. After I decided to rob her I had to figure out some story to get up on her. When I got to her tent she was inside and I called her and asked her if she could let me have some coal oil, that we were working on a

bridge and needed it to grease some bolts. She went in the tent but had nothing to put it in, but finally poured some out of the lamp into a small snuff box. As far as I know this was left on the table. Then I asked her for a piece of cloth. I did not tell her why I wanted it. I was still using this story to get up on her. When she went in to get the cloth I followed her into the tent with my gun in my hand. I said then 'you know what I want,' she said, 'what do you want, money?' I said, 'yes.' She gave me four one dollar bills and some change, which she got out of her purse. I made her leave the tent with me and go on up the hill a little less than a quarter from her tent in a wooded field between her tent and the wire fence. I told her there was something else I wanted. I made her take her pants off and lay down in the field and I got on top of her and we had an intercourse here. When she got up she put her pants in her left pocket, she had on some kind of a jacket. When we got closer to the Vandermark house she asked me to let her go, and I said no, you will holler and get me in trouble. She said no, I will not holler if you will let me go and I will go right to my cousin's house. This is where she gave me some more money, I think it was a five- and ten-dollar bill, which she got out of a tobacco sack which she carried in her bosom. She told me that this was all the money she had and hoped that it would do me some good. I made her go into the Vandermark house, she was begging me not to hurt her or harm her and promising me that if I let her go she would not holler or turn me in. During all this time she told me that she wanted to live as long as she could and again told me if I would not hurt her she would not tell on me, but would go right to her cousin's house. I knew that I had robbed her and wronged her and I decided I had to get rid of her because she knew me. I made up my mind to kill her when we got to the house. I knew that she was going to tell and I had to get rid of her. I knew the Vandermark place well because a friend of mine had farmed there. His name is Clifford Johnson and he had moved away about thirty-five or forty days ago. I knew about the well being about the barn on this place. I promised her

when we left the house that I would let her go. She went to the well and drawed a bucket of water and drank some. I came right after her and also drank some water. After we drank the water she started off, I think to her cousin's house. This is when I first hit her with my pistol. I hit her first somewhere around the forehead and eye. This was just beside the barn. She got weak the first time I hit her, but did not fall. The second time I hit her she went down. I hit her several times more while she was down. She yelled one time when I first hit her. I think she yelled 'Henry.' I think she was dead when I stopped hitting her with the pistol. I lifted her off the ground and carried her to the well. I threw her in. Her feet went in first. There was a good size piece of timber beside the well and I threw this in after her. I then covered the well with the planks that fitted the top. After this when I looked at my gun I saw that the cylinder was missing. I looked for it and found it between the barn where I first hit her and the well. I cleaned it off by rubbing it with some kind of grass, straw or hay and put it in my pocket. One of my hands had some blood on it and I cleaned it with dirt. I then went out the gate, through the woods to my home. When I went into the house my wife was at home. I gave her four one dollar bills. She did not take it, but left them on the table. I told her that I had won the money gambling. I changed my shoes and overall pants and put them behind a box with dirty clothes. I do not know what time it was when I got home, but it was sometime in the afternoon. My wife and I went down town that night and spent some of the money. I also spent some the next day. When I got home that afternoon I put the pistol in the chest of drawers. It was broken. I know it got broke when I whipped her with it because this is the only way I used it. When I made my first statement to the officers I told them that Mrs. Vetito and I had been meeting and dating together for some time and that she wanted me to take her off east with me. This was a lie. I made the first statement the way I did because I thought I could get away with it. I know I did wrong. This is the truth, so help me God. I feel better now and

like I got a burden lifted. I committed a crime and everything and I know that you have got to pay and I am ready and I know what it is going to take.

"The above statement is made by me freely and voluntarily without any threats or promises being made to me and I am telling the truth about this whole matter."

We think there was sufficient evidence to convict appellant, even without the confession. While objection was made to the introduction of the confession on the ground that it embodied two other crimes not charged against him—robbery and rape—we think it was not objectionable for this or any other reason shown by the record. Our Statute, § 2969 of Pope's Digest, provides that "all murder which . . . shall be committed in the perpetration of or in the attempt to perpetrate arson, rape, robbery, burglary or larceny, shall be deemed murder in the first degree."

Appellant did not testify, and he called no witness in his behalf. He asked no instructions, so none were refused. He made formal general objections to the instructions given by the court, but we find no error in any of them. They are the usual instructions defining the different grades of homicide, as fixed by statute, from murder in the first degree to manslaughter, and were as favorable to appellant as he could rightfully ask for. They fully covered the presumption of innocence, the burden of proof and reasonable doubt. No. 26 told the jury that "it is the privilege of the defendant to either testify in his own behalf or decline to so testify. The failure to testify is neither evidence of his guilt nor a presumption of law or fact of his guilt. Such fact is not to be considered by you in determining his guilt or innocence in this case." While this instruction was not requested by appellant, it was given on the court's own motion, out of an abundance of precaution to protect appellant's rights. We think no error was committed in giving it without a request. If it had been requested and refused, it would have been error. *Cox v. State,* 173 Ark. 1115, 295 S. W. 29. See § 3957, Pope's Digest.

The information as set out above is good under § 3852 of Pope's Digest.

We conclude that the record shows no error, and that the verdict and judgment must be permitted to stand. It appears to us that the learned trial court exercised every precaution to see that appellant had a fair and impartial trial, and that he had such a trial.

The judgment is accordingly affirmed.